21-5120 Oceana, Inc. Appellant v. Gina Raimondo in her official capacity as Secretary of Commerce et al. Ms. Treese for the appellant, Ms. Moring for the appellants. Good morning. Council for Appellant, you may begin. Good morning, Your Honors. May it please the Court, this appeal presents two distinct issues with respect to the services management of the Dusky Shark, which has remained overfished for over 20 years as the sole result of bycatch. The first issue concerns the service's misinterpretation of the Magnuson-Stevens Act. The service violated Section 1853 A-15 of that Act by exempting itself from the Act's requirements and failing to establish any measures to actually hold bycatch of Dusky Sharks accountable to the limit the agency specified. The second concerns the service's unsupported conclusion that the measures that included in Amendment 5B will reduce Dusky Shark deaths enough to allow the population to recover. That conclusion was arbitrary and capricious because it relies on speculation rather than reasoned analysis and evidence. Turning to the first issue, I first want to clear up any confusion that might have resulted from the disconnect and the issue that Oceana raised versus what the federal government addressed in its brief, which was whether the Act allows it to specify an annual catch limit of zero. There's no actual dispute that it does allow an annual catch limit of zero. What the Act does not allow is for the agency to set a catch limit of zero and then chronically allow catch to exceed it because it has no accountability measures to hold the catch to that limit. Do you agree with the – it seems to me you do agree, I should put it that way, with the fishery service that catch includes bycatch mortality? Yes, sir. Not all bycatch. It's just the mortality. Yes, sir. Yes, it's the fish that die as a result of bycatch. Okay, but that doesn't include all the ones that are caught. That's right, Your Honor. Yeah, okay. Yes. So the agency's misinterpretation here is embodied in an exception it created in its guidelines, which state that as long as the service sets the annual catch limit at zero and prohibits intentional fishing for a species, it can escape establishing additional accountability measures that hold catch to that limit of zero or, in fact, to any numerical limit. Can I ask you again, are we just dealing here with longline and not netting? We are dealing with a number of fisheries here. We're dealing with at least pelagic and bottom longlines as well as, I believe, gillnet fisheries as well as recreational fisheries. So it's a wide range of gear. How can you catch a 400-pound dusky shark in a gillnet? Those gillnets can be very large and very strong, Your Honor. There are nets that actually catch whales. Yeah, but the longlines, although it's not specified, and I'll let you get on with your argument. I just want to be clear about this. The longlines are actually they're fishing for swordfish and tuna. Is that what it is? Yes, sir. Those are the main target species. OK, thanks. Certainly. The service's interpretation essentially eviscerates the meaning of Section 1853A of the Act, which is clear under Chevron Step 1, as shown by the text and the context and history of that provision. And I'll walk through each of these, starting with the text. Now, Section 1853A15 requires the agency to establish a mechanism for specifying annual catch limits at a level such that overfishing does not occur, including measures to ensure accountability. So starting at the beginning, it requires a mechanism that essentially has two halves, the annual catch limits and the accountability measures. The first half, the annual catch limits, each of these terms has a plain meaning that the service agrees with. As Your Honor was asking about, the service agrees that catch includes bycatch mortality and also agrees that the ordinary meaning of limit is abound not to be passed. And then that phrase is modified by the phrase at a level such that overfishing does not occur. So in other words, the annual catch limit must put a definite bound on bycatch that occurs annually, and that number has to be low enough to ensure that overfishing doesn't happen. So what do you do with the agency's response that the statute doesn't bar what it's done here? And it's in its view, these will reduce the mortality. And this is the first stage. All right. And then if it's not low enough, you know, they can modify what's required. Well, Your Honor, I think that violates the plain language of the acts because the agency's argument is the plain language leaves it a lot of discretion. The Congress didn't bar things. It didn't define things. It said the agency is to carry out the statute. And so in the agency's view, what it did does not contradict any limitation in the statute itself, whereas your argument is no, it has to be able to say definitively that if we do this, then the catch will reduce by 35 percent. Yes, Your Honor. These are these are separate issues. I know you want to define them that way, but the secretary's view is broad discretion. Had Congress wanted to define things the way you say the agency must interpret the statute, it could have done so, but it didn't. Well, the agency is the agency is glossing over a lot of statutory context, as well as the plain text in the history of this provision and taking that provision in taking that position. Well, what's the plain text that bars the limit at not over zero. And what's the plain text that says, if you can't determine specifically that what you're doing is going to reduce it by 35 percent so long as you're on the road to that and you see what this does. And then you come back and if it's not enough, then you do more. Well, the plain text requires the agency to specify a limit. So here it has, it says, they have they specified, pardon me, requires them to establish a mechanism for. What about that language. Yes. So the establishing the mechanism again here, it's envisioning a coherent system where in practical terms, usually what a fishery management plan would do would be would have, for example, a formula or some some mechanism for specifying that actual number year after year. And so that's part of where the mechanism comes in. The mechanism also includes these measures to ensure accountability. I think where, where we part ways with the service, or one of the ways is is what that accountability needs. And when Congress define it in a manner that bars the agency from interpreting as it did. Isn't that your burden. Yes, Your Honor. And if you look at the context of the act and and and read this this provision is part of the overall section 1853 a that section begins with 1853 a one a that requires all all fishery management plans to contain measures necessary and appropriate to prevent overfishing. So, I guess the agency's response would be, yes. And it's getting there, it may not get there the first year the second year but maybe the third year, etc. It has to see what happened. That that's not what the, the statute requires the agency under 1854 he to end overfishing immediately. That's my point. And that's the agency's point where does it says immediately. That is in 1854 he seven, I believe that the agency has to in its rebuilding plan over end overfishing immediately. Um, and Congress actually in the legislative history, looked at instances exactly like the dusky shark it looked at the, the fact that the act had had required the service to end overfishing for decades. And had failed to do had failed to get there. And the overfishing of overfish species, much like the dusky shark remained a significant problem. And in statements, including in Senate report number 109 dash 229 at 21 and 23 to 24, for example, and also at seven Congress emphasize that that failure to end overfishing was resulting from a failure to require catch to adhere to limits year after year to Right, but that's, that's really my point. What the legislative history shows is they tried over decades to do it, it didn't work. What you're arguing is I understand is therefore we must read this statute to say you have to do it within a year. Or you have to do it within a specified time limit. Well, Your Honor, we're not concerned so much with the time limit here is as with the the overall compliance, what the agency is has proposed to do here is always allow catch to be higher than the limited set by some completely unspecified number. So it's, it has basically set up a system where it's always violating the catch limit year after year after year, the bycatch limit for mortality. Anyway, is zero. What happens if the one ship pulls in a dead shark. What was the consequence of exceeding the zero limit. Under the approach, the agency is adopted here, there's no consequence whatsoever. And there's no consequence if if they pull in 500 dead sharks. So I'm wondering, problem here. I'm wondering, you know, I'm wondering if your problem is, is not with the with with the number zero, but with the enforcement of it. Yes, sir. That is exactly the problem here. That is, yes, the problem is that the statute contemplates specifically because this more general approach had not worked for so long that annual catch limits and accountability measures would be added as a specific mechanism to finally require the service to use this specific mechanism to finally end overfishing. What about section 1853 a 11 that says that the service has to reduce bycatch to the extent practicable right and bycatch kind of by its nature is something that's accidental and not intentional. So, I mean, it seems, then, that Congress has given the agency a fair amount of discretion as to, you know, how they reduce bycatch in a way that is practicable. Your Honor, that section provides for more for a broader requirement to reduce bycatch across the board as a matter of reducing waste and notably it it applies to species other than than fish as well. It's it's it requires it's applies in all instances. What Congress was trying to get at with 1853 18 was setting a very specific limit on that bycatch low enough to end overfishing and sticking to that limit ensuring that catch didn't chronically exceed it. So, what he 15 does is add specificity and add an additional mechanism and it's it's basically another additional requirement. The service has taken some steps to reduce, not so much bycatch but mortality. The requirement of circle hooks. Number one, which prevents a gut hook, which will kill the fish usually and then also making the circle hooks non stainless steel, which is important because, you know, if the fish escapes with a hook in his mouth is going to rust away. What else has it done to prevent mortality. We are with respect to that circle hook requirement, notably the study the service relies on their actually states that requiring circle hooks at least in the bottom long line fishery does not have any effect on on reducing mortality because they use a larger J hook on as we discuss in our briefs. They have over the years, there must be, there must be studies going the other way. I mean circle hooks are becoming fairly common in in recreational fishing now because because of the catcher catch and relief release requirements, and it's much easier with a circle hook with a J hook which may get caught in on the interior of the fish. The service hasn't cited any other studies that go the other way. The issue that that this the study found that the service cited was that the, the, in the bottom long line fishery specifically they use a larger J shaped hook that the sharks apparently don't swallow so they don't get gut hooked with that hook. So they in that study they didn't find any difference between using the J hook and the circle hook, even though there are ancillary benefits to other species to using circle hooks. Okay, thanks. Thanks. I'm conscious that I'm, I'm over time right now and would like to reserve time for rebuttal, unless the court has more questions. All right, thank you. We'll hear from Council for Appley. Good morning, I'm at the court I'm Ariel Moran on behalf of federal employees. This court should affirm the district courts judgment service has been working since the 90s to conserve the dusky shark in addition to closing the dusky shark fishery slashing commercial shark quotas. Pardon me I'm having trouble hearing you there's an echo I think that's going on this. There's some adjustment you can make. Can everybody hear me now. That's much better, much better. Wonderful. We're connected to my phone. All right, Council for Appley's please begin. As I was saying, the service has been working since the 90s to conserve the dusky shark in addition to closing the dusky shark fishery slashing shark quotas and retention limits and numerous other measures the service has now instituted six new accountability measures through Amendment 5b. The case fundamentally comes down as became clear during Oceana's presentation to their disagreement with the services scientific judgment regarding the best accountability measures to end up the shark overfishing. So I'd like to start by clarifying the remaining dispute as Oceana just clarified it does not argue that the Magnuson Act precludes the service from setting a limit of zero. Rather it argues that the limit that the service set here is somehow not a limit because Oceana does not believe that the accountability measures that the service chose strictly enforce that limit. What this argument comes down to is a dispute about the appropriateness of the services chosen accountability measures fundamentally not really any issue of statutory interpretation. Oceana's first argument simply collapses into its second. Oceana wanted different accountability measures and argues that it was unreasonable for the service to fail to enact its preferred measures, but it cannot show that the measures chosen were arbitrary and capricious. Before I turn to that sole remaining argument, I want to address briefly Oceana's attempt to reframe its objection to the accountability measures as a statutory interpretation issue. It's clear that Amendment 5b in no way violates the Magnuson Act. The service complied with its plain requirements. It established a mechanism for an annual catch limit and set that annual catch limit at zero and the annual catch limit accounts for bycatch mortality. Let me ask you, as I understand their argument, it's that, why did Congress pass this statute? For decades, the agency had been trying to do this, it hadn't succeeded, so now the statute says establish a mechanism that reduces mortality. And you need to do it by 35%. And what you've done. You may not have adopted what we want by accountability measures, but what you've done isn't enough. And as I understand it, the agency acknowledges that what it's done may not achieve the 35% reduction. So what is your response? The service concluded that the six new accountability measures give a 50% chance of rebuilding. 50%, that's not the same. That's correct. We have a 50% chance. So the chance is not 100, nor could any accountability measure ever obtain a 100% chance. Maybe not, but 50 or 60 is pretty low, given that you're trying to get up to 100. That is true. The service decided that a 50% chance was sufficient here, in light of a couple of things. First of all, massive data variability. In this case, it is very difficult to get information about absolute abundance of dusky sharks. It's also very difficult to get any data about bycatch mortality for dusky sharks. Interactions are incredibly rare. So there isn't much data on this issue. In addition, the most recent stock assessment, which was undertaken through process in 2016, showed five different options for ending overfishing. Now, we have additional data from various ESA petitions that had been instituted that shows that it is likely that the dusky shark population is actually more abundant than the 2016 information gave. Which led the service to conclude that a 50% probability of rebuilding the stock was sufficient. Is the low stock just on the East Coast? As I understand it, this shark is also found in the Pacific Ocean. The sharks are found, for these management purposes, in a number of areas, but largely on the East Coast. It's found near Japan, in some areas in the Pacific, but not for management purposes. In order to make that move, the measures that have taken place so far have created, in the most recent stock assessment, we have seen an order of magnitude lower fishing mortality than in 1999 when the service began management. Overfishing has reduced 87% since 1999. In 1999, we saw overfishing covering around nine times the sustainable level. It dropped to 1.59 in 2011 and 1.18 in 2016. So I think that that puts in context what the service is trying to do here. It's trying to make that small move from 1.18 times the sustainable level down to one. That's the overfishing limit. The service implemented six new accountability measures in Amendment 5B to make that shift from 1.18 down to one. The service concluded that those measures give it a 50% chance of rebuilding the stock, but a 77% chance of immediately ending overfishing. Those accountability measures include requiring recreational shark fishers to complete an online training course, which will increase their ability to identify dusky sharks and release them with a minimum of harm. There's substantial research supporting this measure. Research on other United States Atlantic prohibited species, such as the Fournese Skates, have demonstrated that a focused outreach and species identification training can improve compliance rates with prohibited species regulations over 98%, including reducing illegal land days by 95%. Additionally... Let me understand this a little better. You do or the agency does receive information that on fishing expedition out of X Harbor from June through August resulted in, let's say, 500 deaths. And the... Either the fishermen or the oversight agency run by the fishermen are supposed to report deaths, correct? So if the agency is having difficulty getting the information, why can't the agency tighten up its reporting requirements? There's no way to tighten up the reporting requirements for a number of reasons. First of all, misidentification. Dusky sharks are relatively difficult to identify and look like a lot of other ridgeback sharks. So we're not... Oh, the fisherman's not going to know what he or she caught? Well, many of the regulations prohibit bringing the sharks onto the deck. So we're talking about sharks that are in the water. They know that they have to release almost all ridgeback sharks because they're prohibited species. So the fishermen are trying to de-hook these shark species and often are not making attempts to identify them, or if they are making attempts... Without pulling the fish out of the water. So all you're seeing is the snout, mostly. Right, exactly. Because bringing the fish onto the deck increases mortality substantially, we've prohibited that. But that means that trying to identify dusky sharks is incredibly difficult. We're not getting very good data on identification or mortality for dusky sharks. The service also realized that there is a potential problem for either under or over-reporting. It's possible that fishermen want fewer regulations and so are either under-reporting dusky shark mortalities or want it to look like dusky shark abundance is increasing, which would lead them to over-report dusky shark mortality. We simply don't have good data. In addition, dusky shark interactions are pretty rare as it goes. So we're not seeing a lot of interactions with dusky sharks, which is also causing... The Fishery Service has inspectors on some boats, doesn't it? The Fishery Service does have observers on a certain number of boats, but for obvious reasons cannot have 100% observer coverage on every fishing trip that is taken. Is there anything in the record to indicate what percentage of fishing boats they have inspectors on? There is some information in the record. It depends on any given year. It depends on the fishery. It can be something like 10% of fishing trips that have an observer on depending on the particular fishery. And the observer coverage isn't excellent and doesn't account for everything. But fundamentally, what matters is that the service did conclude that there's a 50% likelihood of rebuilding stock and a 77% likelihood of ending overfishing. And the measures that it's taken, in addition to being supported by data, also have, frankly, intuitive appeal. They're very easy to explain because it's clear that they will end overfishing. The first, as I was explaining, is supported not only by the Curtis and Sosebee 2016 study, which shows a reduction in illegal landings by 95%, but also the Poisson 2016 study indicating that safe handling and release increases post-release mortality rates. The service also considered the unique identification difficulties that Oceana raises. The service considered those difficulties and designed the training specifically on identifying ridgeback sharks. As I mentioned, almost all ridgeback sharks are prohibited species. And so all those are our difficulties in identifying dusky sharks, particularly as opposed to other ridgeback sharks. Are all the ridgeback sharks migratory? I don't know if all ridgeback sharks are migratory, unfortunately. So the training has to focus on identifying ridgeback sharks as opposed to identifying dusky sharks in particular. So fishers don't need to identify the difference between a dusky shark and a silky shark or the difference between a dusky shark and other prohibited ridgeback sharks. Ridgeback sharks have more readily identifiable features, specifically the bridge between two interdorsal fins that make them readily identifiable. Then when we go to the second measure, this required recreational shark fishers to use these non-offset, non-stainless steel circle hooks, which reduces mortality of released dusky sharks. We know that circle hooks are up to 66% less likely to lodge in the throat or the gut of a dusky shark than J-hooks. The Wiley study evaluated the use of circle hooks in recreational fisheries and found that circle hooks should reduce the mortality rate of hooked dusky sharks by 63%. While Oceana contends that the surface did not specifically add up the number of mortality reductions. The circle hooks are required not only for recreational, but also on the long line, right? Yes, that is correct on the bottom long line. Which increases the cost for the fishermen, right? Because the hooks will rust. That is true. The service has an obligation to end overfishing and those conservation measures sometimes increase costs. All of that is considered in the environmental impact statement. Yeah, okay. Now, I think I'd like to turn to compiling a bit of this data. Oceana contends that we cannot reach this 35% mark, but we don't need to specifically add every measure up to reach 35%. Because it's clear that the measures in totality will reach 35%. For example, we know that recreational fisheries cause a majority of dusky shark interactions and bycatch mortality. The best data we have show that bycatch mortality in the hundreds in the recreational fishery versus tens in the commercial fisheries. That's an order of magnitude difference in that data. So, let's say for a conservative estimate that 55% of bycatch mortality is caused in the recreational fishery. There's two measures that the service has instituted in that fishery. First, the circle hook, which are expected to reduce bycatch mortality by 63%. And second of all, the training measures, which should reduce landings by 95%. Even if you just take 63% of a 55%, you get to 35%, which is the total reduction in mortality that the service needs. Of course, this assumes that bycatch mortality comes from the release sharks and not from misidentification of landed sharks. But in that case, the training measures should reduce landings by 95%. Of course, 95% of 55% lands you at 52%, which overshoots the 35% mark. But it cannot be true, as Oceanics intends, that each measure must have a substantial effect, even if any individual measure were not given to the service. For recreational, I mean, I understand from what I've read that these sharks move into shallower water. And so it would be surf fishing, for example, would be one of the recreational methods of catching them. But do you have to get a federal fishing license? I thought that was all regulated by the state. Surf fishing. I'm sorry, do you need a federal fishing license for what exactly? Supposed I go out with a surf rod and I'm fishing for something else, but with a baited circle hook. Do I need a federal license to go out and do that? Because I might catch a dusky shark? If you're in federal waters and you want a... I thought that was all regulated by the state. That's why I'm wondering. There's also state regulations. So the Fisheries Service works in conjunction with states and it depends on the waters that you're in. One thing I'd like to address, because it came up earlier, was the enforcement mechanism. It isn't true that there is no enforcement mechanism here. Fishermen face penalties under the Act for non-compliance with the protocols. C-50, CFR, 635.21, C-6I, and also 635.71. Our enforcement works with the U.S. Coast Guard, works with different state enforcement agencies to enforce the regulations. And you can find that penalty schedule for HMS penalties. So how does that work? You have a boat where there's no observer on it and it pulls in and has its catch. Is it required that the captain report the mortality of the sharks in that fishing voyage? And then gets fined for it? Sounds like a Fifth Amendment violation. The way that this usually works is that the sharks will be brought into port and there's a variety of state enforcement agencies and also Coast Guard. And so it isn't that 100% of dusky shark mortalities will be caught by some enforcement regime. But there is an enforcement regime and there is an ability to institute civil penalties. Another question that I couldn't figure out. These long lines are sometimes in the water for as much as eight hours. Is that right? And if a fish gets hooked when it first goes down, the chances are that fish is going to die by being hooked there for eight hours. What do they do? What do the fishermen do when they bring that line and they've got all these dead fish on it? Do they just throw them back into the ocean? They don't try to process them for human consumption, do they? I don't know how all of the fish species are handled. I just know for dusky sharks, they have to be de-hooked and thrown back into the water, either whether they're alive or dead. In order to prevent incentives for catching dusky sharks. It would seem to me that there's an incentive to get the long line out of the water as quickly as possible because otherwise you're going to lose a large amount of the catch. Well, I think that not all fish, of course, are hooked at the very beginning of that time. And so the soak times, as opposed to the hook times, are an important thing to remember that there's a difference between, especially with regard to dusky shark bycatch. OK, thank you. If there are no further questions, then we would rest on our brace and ask the court to affirm. Thank you, counsel. Counsel for Appellant? Thank you, Your Honors. I first want to clarify that there are two very distinct issues and the measures we're talking about are different in each. The first issue is that there are no accountability measures that hold catch to zero and the agency admits that catch will always be above zero. And there is not, there may be enforcement for an individual fisherman catching something, catching a shark or failing to follow a protocol. But there is no measure to react to excessive catch above the catch limit, whether that's by five sharks or 500. Now, the rebuilding measures in Amendment 5B, like the circle hook requirement, are separate. They are not accountability measures. They're not ensuring accountability to zero or any other number. And there are, I think I also want to clarify, switching over to those rebuilding measures, I want to clarify a couple of things in response to what counsel said. The agency admits at multiple places in the record that it cannot estimate how much overall mortality any of these measures, overall mortality reduction, any of these measures will result in. For example, at JA 593, 599 to 600, 606. So the rates that the services counsel is talking about are rates that apply to studies on different species. And the service doesn't even know what the overall number of dusky sharks is, how many are caught in a recreational fishery, how many are caught versus how many are caught in a pelagic longline fishery. So they have no idea what that overall mortality reduction would be from applying that rate of mortality reduction. And I also just want to note that the service also stated itself that all of these measures have to have to work in order to get that to that 35%. And that's not true. I mean, at several places, the service talks about how collectively these measures will add up to a reduction or cumulatively they will work to reduce mortality by 35%, for example, at JA 593 and 698. So if one or two of those measures doesn't work up to their assumptions and their assumptions are based on some pretty thin evidence, the whole package is likely to fail. And as was discussed earlier, that whole package, with absolutely full success, only has a 50% chance of rebuilding the species. I mean, if everything goes right here, there's only a 50-50 chance that this species will finally rebuild by the next century. I guess what troubles me in part about your argument is intellectually you may be correct, but practically, how do you enforce an absolute limit, given the nature of the industry, the nature of the fish, the difficulties in getting data, etc. Well, Your Honor, the notion of practicability is one that Congress specifically considered when it was going back to the meaning of 1853 A15 and the enforceability of catch limits. That's my point, basically. That's what my next point was going to be, that is that, you know, Congress understood this. Yes, Your Honor, but Congress, in both the statutory context, we see that Congress included the notion of practicability in other provisions, including in 1853 A13 and A11, but specifically left it out here. Now, in order to buy the government's reading, the provision would have to read something like, establish a mechanism to specify annual catch limits and measures to ensure accountability to the extent practicable, but it left that phrase out here. We have to assume that it did so intentionally. Now, if we look back at the legislative history, you'll see that Congress specifically heard concerns about uncertain data and reporting on the ability of the agency to set catch limits and accountability measures and responded, in fact, that instead of inserting the practicability, it expected that having to set these annual catch limits and managing to those limits would result in better reporting and data collection. And that statement is at Senate Report Number 109-229 at 24, for example. I don't doubt that that's in there. And you acknowledge that for the agency's system to work, everything has to add up. Well, the agency can find out if things add up and if they don't, make adjustments. But what I don't understand at this point is, there's no accusation that the agency acted in bad faith, that it had data directly contradicting the conclusions it reached. Well, it did have, at least with respect to the circle hook requirement in the bottom longline fishery, the study it relies on specifically did find that they looked at the effects of using circle hooks versus the larger J hooks that the bottom longline fishery uses and found no difference in mortality. So that study does contradict their finding. And with respect to the agency being able to try things out, the agency was obligated at the time it promulgated Amendment 5B to find that it was reasonably likely that this would be successful in rebuilding this species. And so it had to determine at that time that these measures were supported by evidence and are reasonably likely to work. Reasonably likely to work based on the evidence and their problems with the evidence. That's what I don't understand about your argument. Well, Your Honor, there's no question that deference is due to the agency when it applies evidence and makes a decision consistent with it. No, but if it doesn't have that evidence and there's a reason why, first of all, you can't pull the shark out of the water, so they're difficult to identify, all kinds of things. So, I appreciate your argument, but I don't see Congress mandating what you are saying is mandated in the manner you say it is mandated. That's all I'm trying to understand. Well, I think with respect to the rebuilding measures, the agency did have data on a couple of measures that it rejected. So they were not entirely without data. For example, they did have data showing that prohibiting the use of pelagic longline gear in certain areas with very high dusky shark bycatch could reduce bycatch mortality in that fishery by 28%. Now the agency chose not to use that measure, but they had that data directly relevant to that fishery and directly relevant to dusky sharks. So they weren't without any sort of direct science to use. Right, but it decided to go another way. Yes, Your Honor. And even then, however, they still, in absence of data, they have to make some reasonable showing that the measures will be successful in order to meet the mandates of the Act in terms of rebuilding and reducing mortality. They can't simply fall back on saying that it's just their expertise. Well, in their best judgment, evaluating what's out there, etc. That's all I'm trying to understand. Yes, Your Honor, I think there's simply a lot of assumptions based on absence of data made here that the agency's own track record has shown isn't working. And they actually have quite a long ways to go here. I mean, they have to reduce mortality by more than a third. It's not just a small task ahead of them that can be solved by nibbling at the edges. Now, I think, again, with respect to the annual catch limit, that is a separate issue. And I think it's very important to give effect to Congress's intent here that Congress did not intend to allow the agency to set one number as its limit. And then allow it to completely be violated. I mean, that eviscerates the ordinary meaning of the term limit and certainly reads any accountability out of the Act. Because a limit that's routinely surpassed without any consequence is simply not a limit in any real-world sense. And I'm conscious that I'm over time, but I want to make sure that I'm answering all of the Court's questions here. Any further questions? Thank you. We'll take the case under advisement.
judges: Rogers, Rao, Randolph